(C. D. 801)

JOHN BARR v. UNITED STATES

United States Customs Court, Third Division

(Decided July 30, 1943)

*Strauss & Hedges; Barnes, Richardson & Colburn (J. Bradley Colburn and Eugene F. Blauvelt* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Joseph F. Donohue,* special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

EKWALL, Judge: The question involved in this case is the proper rate at which the currency of the invoice of certain imported goods should be converted into United States dollars under the provisions of section 522 (c) of the Tariff Act of 1930. The merchandise consists of wool cloth manufactured in Scotland and exported to this country on May 3, 1940, under an invoice made out in pounds sterling. For the purpose of assessment of the ad valorem duty upon this wool cloth it was necessary for the collector of customs at the port of entry to convert the pounds sterling to United States currency.

On the date of exportation the Federal Reserve bank, acting under authority of section 522 (c) of said Tariff Act of 1930, determined and certified to the Secretary of the Treasury two buying rates for pounds sterling, viz, an "official" rate of $4.035 and a "free" rate of $3.475138. The collector of customs, acting under instructions of the Secretary of the Treasury (T. D. 50134), used the "official" or "controlled" rate and it is the contention of the plaintiff herein that he should have adopted the "free" rate noted above. In this connection it may be noted here that the term "official" applies to the rate fixed by the British Government and does not signify official action of the Government of the United States.

Section 522, *supra*, provides as follows:

SEC. 522. CONVERSION OF CURRENCY.

(a) VALUE OF FOREIGN COIN PROCLAIMED BY SECRETARY OF TREASURY.—Section 25 of the Act of August 27, 1894, entitled "An Act of reduce taxation, to provide revenue for the Government, and for other purposes," as amended, is reenacted without change as follows:

"SEC. 25. That the value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value; and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the Director of the Mint and be proclaimed by the Secretary of the Treasury quarterly on the 1st day of January, April, July, and October in each year."

(b) PROCLAIMED VALUE BASIS OF CONVERSION.—For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after the day of the enactment of this Act, wherever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subdivision (c), shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of section 25 of such Act of August 27, 1894, as amended, for the quarter in which the merchandise was exported.

(c) MARKET RATE WHEN NO PROCLAMATION.—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange.

The facts have been submitted upon a stipulation accompanied by certain documentary exhibits. The Government produced three witnesses. The relevant stipulated facts may be summarized as follows. Under the Defence (Finance) Regulations, 1939, beginning

September 3, 1939, there were adopted by the United Kingdom certain regulations affecting the internal control of currency. The first of these required that all persons resident in the United Kingdom who at the time the regulation went into effect possessed or thereafter acquired any foreign currency, should offer it or cause it to be offered for sale to the Treasury at a price (rate of exchange) determined by the Treasury. By amendment to the last-named provision, under date of September 21, 1939, it was provided as follows:

Where any goods are exported from the United Kingdom, the person making entry of the goods shall, if required so to do by or on behalf of the Commissioners of Customs and Excise, deliver to the collector or other proper officer, together with the entry, a declaration in such form, signed by such person, and containing such information relating to the export of the goods and the sum to be received or which is expected to be received in respect of the goods, as the said Commissioners may require with a view to facilitating the enforcement of this Regulation and the obtaining of information as to the amounts obtainable in foreign currency (whether a foreign currency to which this Regulation applies or not) by reason of the export of goods.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

It was further provided that exchanges of certain foreign currency (including United States dollars) and pounds sterling in the United Kingdom should be made only through the Bank of England or an "authorized dealer." (Statutory Rules and Orders 1939 No. 1251, Emergency Powers (Defence) Finance.) (Exhibit 2.)

On November 23, 1939, there was promulgated an order directing that

Except with permission granted by or on behalf of the Treasury, no person other than an authorised dealer shall, in the United Kingdom, buy or borrow any foreign currency or any gold from, or lend or sell any foreign currency or any gold to, any person not being an authorised dealer. [Statutory Rules and Orders 1939 No. 1620 Emergency Powers (Defence) Finance. Exhibit 3.]

This currency control on the part of Great Britain was effective only within the United Kingdom and not until March 25, 1940, did the British Government by specific regulation extend its currency control to this country. Under the Order in Council of March 7, 1940, effective on March 25 [Statutory Rules and Orders 1940 No. 291 Emergency Powers (Defence) Finance. Exhibit 4], payment for certain enumerated exports to the United States was required to be made in either United States dollars or pounds sterling purchased in the United Kingdom from the Bank of England or an agent of such bank at the fixed British "official" rate of exchange However, this order did not apply to woolen goods of the character of those here involved.

At all times prior to March 25, 1940, the Federal Reserve Bank of New York certified daily to the Secretary of the Treasury one buying rate for the pound sterling. Beginning on that date the Federal

Reserve bank began to certify under section 522(c), *supra,* two rates of exchange, one of which was designated "free," and the other "official," the latter being the rate fixed by or on behalf of the British Treasury. As above stated, the rates determined by the Federal Reserve bank and certified to the Secretary of the Treasury for May 3, 1940, the date of exportation in this case, were an "official" rate of $4.035 and a "free" rate of $3.475138. The Secretary instructed collectors to use the "official" rate and published that rate only.

It is contended on the part of the plaintiff herein that under section 522(c), *supra,* determination of buying rates by the Federal Reserve bank is final and conclusive and the Secretary of the Treasury has no discretionary power to vary, set aside, or nullify such determination. The Government contends that the said section contemplates the determination, certification, publication, and use of only one buying rate for each single currency; therefore, it alleges, the determination and certification of two rates for May 3, 1940, was improper and the Secretary of the Treasury should either (1) have rejected both rates or (2) have determined which certified rate was proper.

A reading of the statute involved bears out the plaintiff's argument. It states in plain unambiguous language that the buying rate "shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury." It further provides that the Secretary of the Treasury "shall make it public at such times and to such extent as he deems necessary." Nothing in the language quoted can by any stretch of the imagination be interpreted as conferring power upon the Secretary to accept or reject any rate, or to make any determination as to whether the rate is or is not proper. The only authority given the Secretary is to make such determination public and in this he is given discretion as to the time and extent of the publication. On the question of the use of the singular noun as denoting that only one buying rate is contemplated and that the certification of two rates was improper, it is a well-known rule in construction of statutes that when it is necessary to give effect to the legislative intent, words importing the singular only will be applied to the plural of persons and things. (See 36 Cyc. 1123, 1.)

It is the duty of the court in interpreting the law to endeavor insofar as possible to carry out the will and intent of the lawmakers. In so doing we must endeavor to arrive at the object to be attained. The purpose of laws imposing ad valorem duties on imported merchandise has always been to take as the basis upon which duties are to be computed the true value of the goods in the country which produced them or in which they were obtained, such value to be ascertained by the actual purchase price or by the market value as a basis. To this end the various revenue laws have from time to time introduced new provisions in order that collectors may fix the foreign value

correctly and in order that duties shall be uniform. The regulation by statute of the value of foreign currencies is designed to accomplish that purpose. Where the value of merchandise is expressed on the invoice in depreciated currency the various statutes have provided a method of determining whether the assumed value of the foreign currency remains unchanged and whether the actual value corresponds with the nominal value, in order to carry out the intention of Congress by keeping the fluctuations of nominal values to the standard of specie values.

In very early times the value of foreign coins was fixed by statute and was based upon their pure metal value as expressed in money of account of the United States. By the act of March 3, 1873, all prior acts were repealed and a general law was substituted whereby it was provided that the value of foreign coins should be that of the pure metal, declared annually by the Director of the Mint, and proclaimed by the Secretary of the Treasury. By the act of August 27, 1894, Congress for the first time took cognizance of an alternative basis for the conversion of foreign currencies and in the proviso to section 25 of that act the Secretary of the Treasury was permitted to order the reliquidation of an entry at a value different from that of the pure metal value of the foreign coin "whenever satisfactory evidence shall be produced to him showing that the value in United States currency of the foreign money specified in the invoice was, at the date of certification, at least ten per centum more or less than the value proclaimed during the quarter in which the consular certification occurred." Thus for the first time the Secretary of the Treasury was empowered to determine the exchange rate and his determination thereunder was held to be conclusive. *United States* v. *Whitridge*, 197 U. S. 135, 49 L. ed. 696.

In the Emergency Tariff Act of 1921 (section 403) the method of determining foreign exchange values was revised and in place of the discretionary power theretofore granted to the Secretary of the Treasury the determination of the values of foreign currencies was placed in the Federal Reserve Bank of New York. The Court of Customs Appeals (now the Court of Customs and Patent Appeals) in the case of *Fry & Friedsam* v. *United States*, 12 Ct. Cust. Appls. 486, T. D. 40694, had occasion to discuss this revision and the reasons therefor. We quote from their decision as follows:

It will be observed that section 403 of the emergency tariff act of May 27, 1921, purports to be, and is, a complete revision of said section 25; that said section 25 is repeated without material change until that portion of said section is reached in and by which a method is provided for ascertaining foreign exchange values. That portion of said section is omitted from section 403 of the act of May 27, 1921, and is therefore repealed. In lieu of the method provided by said section 25, a new method of ascertainment of the value of foreign currency is provided, namely, a determination by the Federal Reserve Bank of New York,

which shall be certified daily to the Secretary of the Treasury, and which said valuation as to any importation shall be effective at noon on the day of exportation.

It is evident this change in our method of fixing foreign currency values was brought about by the violent fluctuations in the values of foreign currency during the period immediately following the World War, and which existed at the time of the enactment of said emergency tariff act of 1921. By said section 25, cumbersome and slowly moving machinery was provided by which, on special occasions, and upon the production of "satisfactory evidence," the Secretary of the Treasury might ascertain and fix a different exchange value from that proclaimed by him for the quarter. By said section 403, for purposes of celerity and dispatch, a departure from the proclaimed exchange rate may be had when "the value so proclaimed varies by 5 per centum or more," a fact which obviously must be found in the first instance by the collector.

Said section 403 was reenacted as section 522 of the Tariff Acts of 1922 and 1930.

In view of this change in procedure in 1921 the contention of the Government that the Secretary of the Treasury had the power to either reject both rates certified by the Federal Reserve bank in the instant case or to determine which of the two rates was proper, is without merit. The Secretary's power is merely the ministerial one of proclaiming the estimated value. It is the opinion of the court that when the Federal Reserve bank on the date of exportation of the instant merchandise, viz, May 3, 1940, certified two buying rates for pounds sterling, one denominated "free" and the other "official" it was the duty of the Secretary, under section 522 (c), *supra*, to publish both rates.

Nowhere in said section 522 (c) is the Secretary empowered to determine the legal rate of exchange. The certification of the Federal Reserve bank leaves no discretion on the part of the Secretary as to whether he shall accept the rate or rates. It is true that under the general powers granted him over collectors of customs he could direct that either one of two rates certified should be used, but such instruction would not preclude judicial inquiry in order to determine which of the two rates certified was applicable.

We are not unmindful of the holding of the Supreme Court of the United States in the case of *Hadden* v. *Merritt*, 115 U. S. 25, 29 L. ed. 333, that alleged errors in the estimate of the value of foreign coins could not be shown in judicial proceedings to affect the rights of the Government or individuals. The question here presented is not an alleged error in the estimate of the value of the foreign currency, but the correctness of the action of the collector in selecting one of two rates estimated and certified by the Federal Reserve bank. The collector is the official charged with the duty of converting currency and he must look to the statute for his authority. Even where conversion was made under the order of the Secretary, as is the case here, such action has been held to be that of the col-

lector and not the Secretary. See *United States* v. *Parkhurst & Co. et al.*, 12 Ct. Cust. Appls. 370, T. D. 40522, and *United States* v. *Lucius Beebe & Sons*, 122 Fed. 762.

The motion of Government counsel to dismiss this case on the ground that it presented no question over which this court had jurisdiction was denied, primarily because it was the opinion of the court that the ends of justice would best be served if the case were presented on the merits at which time the court would be in possession of all the facts and would be in a better position to decide the jurisdictional question. In view of what we have said above it is the opinion of the court that the questions presented are justiciable and that the motion was properly denied.

The court having decided that the Secretary's action in directing which of the rates certified was to be used by collectors of customs without regard to the circumstances of the importation or to the law of the country of export, was beyond the scope of his powers, we must look to the action of the collector and determine which of the rates certified and made public is applicable in the case before us. On May 3, 1940, the date of exportation of the instant merchandise, this wool cloth was not covered by the Order in Council in effect at that time, requiring payments for certain exports to the United States to be made in either United States dollars or pounds sterling purchased in the United Kingdom from the Bank of England or an agent of such bank at the fixed British "official" rate of exchange. Therefore the action of the Secretary of the Treasury in arbitrarily directing the collector to select the "official" rate in converting the currency of the invoice in the instant case was unwarranted. It may be noted that the stipulation herein recites that the payment in this particular case was made at the exchange rate of $3.21. True, this rate of exchange has little bearing on the question presented; nevertheless it raises an inference that the currency of the invoice here involved was in pounds sterling which were convertible at the "free" rate.

For the foregoing reasons, in arriving at the proper basis under the statute, section 522(c), *supra*, for conversion of the pound sterling in which this invoice is expressed, we hold that it was the duty of the collector to use the rate designated "free" certified by the Federal Reserve bank on the date of exportation, viz, $3.475138.

The conclusion we have arrived at is in conformity with the reasoning and holding of the court in *Henry P. Isham* v. *United States*, Abstract 46189 (Old Series); *A. J. Bracher Co.* v. *United States*, T. D. 47935, 68 Treas. Dec. 404; and *Macksoud Importing Co. et al.* v. *United States*, T. D. 48442, 70 Treas. Dec. 114, affirmed in *United States* v. *Macksoud Importing Co. et al.*, 25 C. C. P. A. (Customs) 44, T. D. 49041.

Judgment will be rendered in accordance with the above holding.