(C. D. 1013)

JOHN BARR *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 21, 1946)

*Strauss & Hedges* and *Barnes, Richardson & Colburn* (*J. Bradley Colburn* and *Eugene F. Blauvelt* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Joseph F. Donohue,* special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

EKWALL, Judge: The question for determination here is the proper rate at which the currency of the invoice covering an importation of woolen goods from England should be converted into United States dollars under section 522 (c) of the Tariff Act of 1930. (46 Stat. 739, 31 U. S. C. sec. 372 (c).) Exportation from Great Britain took place on June 17, 1940. On that date under authority of section

522 (c), *supra,* the Secretary of the Treasury certified two rates of exchange for pounds sterling, to wit:

Official_____ $4. 035
Free_____ 3. 665

In liquidation, the collector of customs at the port of entry converted the pounds sterling to United States dollars at the "official" rate of exchange as certified by the Federal Reserve bank for June 17, 1940.

Section 522 provides for the estimation by the Director of the Mint and the proclamation by the Secretary of the Treasury of the value of foreign coins and currency. Subsection (c) thereof reads as follows:

If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange.

It has been stipulated that these woolens in suit were purchased and paid for with pounds sterling obtained in the New York market for cable transfer at the "free" rate in effect on the day of purchase of such currency. The record in the case of *John Barr* v. *United States,* 11 Cust. Ct. 88, C. D. 801, was incorporated herein. There was also introduced in evidence on behalf of the plaintiff as exhibit 1, a Notice to Banks and Bankers, issued by the Bank of England on June 8, 1940, amending regulations in respect to the exportation of goods from the United Kingdom. No other evidence was introduced.

It is the claim of the plaintiff that the pounds sterling as expressed on the invoice should have been converted at the "free" rate of exchange, i. e., $3.665.

In the incorporated case, this court sustained the plaintiff's contention. That judgment was affirmed by the Supreme Court in 324 U. S. 83. The woolens there involved were exported on May 3, 1940, at a time when regulations of the British Government provided that certain commodities (which did not at that time include woolens), if exported to the United States on and after March 25, 1940, should be paid for either in United States dollars or in pounds sterling purchased at the "official" rate of exchange. In view of proof that the woolens there involved were purchased and paid for with pounds

sterling obtained at the "free" rate, it was held by this court and the Supreme Court that the proper rate for the conversion of the currency of the invoice there involved was the "free" rate of exchange determined and certified by the Federal Reserve bank for the date of exportation of the merchandise.

Other issues were raised and determined in the first *Barr* case, but are not contested here.

The principal point of difference in the two cases, aside from the question as to whether plaintiff has sustained his burden of proof that the merchandise is of the class or kind permitted export from Great Britain upon payment in "free" pounds sterling, lies in the fact that the woolens in the earlier case were not included within the class or kind of merchandise which the British Government required to be purchased with pounds acquired at the "official" rate if intended for export. In the instant case, due to an amendment of the Order in Council 892 of the United Kingdom, one who purchased woolens for export must have acquired pounds sterling at the "official" rate except where an exemption was granted by the British Treasury.

Said Order 892 provides in part as follows:

(1) Subject to any exemptions which may be granted by order of the Treasury, no person shall, except with permission granted by or on behalf of the Treasury, export goods of any class or description to a destination in any territory to which this Regulation is applied by order of the Treasury, unless it is shown to the satisfaction of the Commissioner of Customs and Excise.

(a) That payment for the goods has been made to a person resident in the United Kingdom in such manner as may be prescribed in relation to the territory in question * * *

The prescribed manner of payment of goods destined for the United States was specified to be in United States dollars or in "official" sterling.

Before proceeding to a consideration of the merits of the controversy, we must first determine whether plaintiff has sustained the burden of proving that these goods were granted exemption from the prescribed manner of payment for all goods intended for export to the United States. As evidence that the right to grant exemptions was exercised by the British Treasury, plaintiff introduced and there was received in evidence the aforesaid exhibit 1, a Notice to Banks and Bankers, issued by the Bank of England, under date of June 8, 1940, and effective June 10, 1940. The instant merchandise, as above stated, was exported on June 17, 1940. This notice waives the requirement of payment in "official" pounds sterling or United States dollars in case of "pre-zero contracts."

It states:

* * * Permission to ship under a pre-zero contract will be given only in cases where the exchange has already been covered by the purchaser of the goods prior to the 8th June, 1940, in respect of a sales contract made before that date.

A "pre-zero" contract is defined therein as a "contract of sale of goods entered into prior to 8th June, 1940." Permission to export in respect to shipments under "pre-zero" contracts is limited to shipments taking place not later than September 8, 1940.

It is plaintiff's contention that as the regulations were in the nature of conditions precedent to the right to export from the United Kingdom to the United States during the period in question, compliance therewith was necessary before merchandise could be exported. Therefore, he alleges, as this importation was made in the regular course of business, it must be assumed, in the absence of evidence to the contrary, that existing law and regulations had been fully complied with, and that such proof would pertain solely to compliance with the laws of the United Kingdom, a matter outside the jurisdiction of this court.

Counsel for the Government, on the other hand, contends that plaintiff proved only that payment for this merchandise was made in "free" pounds; that he did not show that the goods were purchased pursuant to a contract executed prior to June 8, 1940, nor that they were purchased pursuant to any contract, nor did he show the date on which the pounds used to pay for the merchandise were acquired. Government counsel further contends that under the well-known rule that presumptions rest on the theory of judicial notice, no presumption can arise here inasmuch as the date of the contract or even the existence of a contract does not have the requisite notoriety which entitles it to judicial notice.

The invoice, which is in evidence, being part of the official papers transmitted to the court by the collector, contains the following notations:

Order No. 601—Accepted 29/1/1940 and Order No. 607—Accepted 30/3/1940.

The inference may reasonably be drawn from these notations, the evidence of payment in "free" pounds sterling, and the applicable law and regulations of the United Kingdom, that said law and regulations have been complied with in this case. From this inference, the presumption arises that the regulations of the British Government were complied with, which presumption has not been refuted.

On the question as to whether the currency of the invoice should be converted at the "free" rate for pounds sterling, we must examine the United States Supreme Court decision in the first *Barr* case, *supra*.

The court there held that the Federal Reserve Bank of New York may certify and the Secretary of the Treasury may proclaim more than one buying rate for a specified foreign currency under section 522 (c), *supra*. It further held that where dual buying rates have been certified the rate applicable to the particular transaction should be used. We quote the language of the court applicable to the facts and the law there presented, as follows:

* * * Dual or multiple exchange rates have resulted in recent years from measures for the control and restriction of foreign exchange and export transactions. In the present case the British Government fixed the "official" rate for the purchase of specified commodities for export. One who purchased woolens for export need not acquire pounds at that rate. A lower rate was available and was indeed taken advantage of by petitioner when he purchased pounds to pay for the woolens. If the higher "official" rate is used in the valuation of the woolens, the cost of the goods will be distorted and an inflated value for customs purposes will be placed upon them. Such a result would be quite out of harmony with the history of these statutes and should be avoided unless the result is plainly required by the language of § 522 (c). We do not think it is.

A different situation is presented in the case at bar. In order to export woolens at the time of the instant exportation from England, it was necessary to show to the satisfaction of the Commissioner of Customs and Excise that payment for the goods had been made in "official" pounds, except in cases in which an exemption had been granted by order of the British Treasury. It is true that here, too, a lower rate was available and was taken advantage of by the plaintiff when he purchased pounds to pay for these woolens, but only by reason of the exemption, in this case possibly by reason of "pre-zero" contracts, i. e., contracts of sale of goods entered into prior to June 8, 1940.

The Supreme Court in its decision interpreted section 522 (c), *supra*, as follows:

* * * But § 522 (c) means to us that that buying rate is to be used which is in fact applicable to the particular transaction. * * *

And after discussing the legislative history of the currency statutes, the court, speaking through Mr. Justice Douglas, said:

* * * The language of § 522 (c) read against the background of these statutes indicates to us that Congress undertook to provide in each case the rate which gives the closest approximation to the value in dollars of the imported merchandise. That purpose would be thwarted if in the circumstances of this case only one buying rate could be used in making the valuation of the goods. The application of the "official" rate to this particular transaction would assume that petitioner imported whiskey, furs, tin, rubber, or jute rather than woolens. The valuation of the woolens would be inflated and a higher duty would be paid than a fair reading of § 522 (c) necessitates.

It is said that this result runs counter to the provisions of § 402 of the Act which require that the value of imported merchandise shall be the "foreign value or the export value, whichever is higher." But it is not apparent how that policy need in any way be defeated or impaired by the use of the "free" rate of exchange where it is in fact applicable.

Under the changed circumstances due to the change in the British law it can no longer be said that "The application of the 'official' rate to this particular transaction would assume" that merchandise other than woolens had been imported. Nor can it be said that "The valuation of the woolens would be inflated and a higher duty would

be paid than a fair reading of § 522 (c) necessitates." This is so because of the statutory definitions of value as found in section 402 of the Tariff Act of 1930. That section, in defining both foreign value and export value, fixes the time of ascertaining such values as the date of exportation, and the price as that at which all purchasers can buy.

The Supreme Court decision in the earlier *Barr* case, as set forth above, interprets section 522 (c) as an indication on the part of Congress "to provide in each case the rate which gives the closest approximation to the value in dollars of the imported merchandise." We must not confuse "value" with "cost" of the imported merchandise.

In the case of the woolens now in suit the importer presumably was able to obtain his merchandise at a lower cost to him because of the exemption in the law and regulations of the United Kingdom from the restrictions applying to merchandise, the contract for which had been entered into prior to June 8, 1940. However, it is to be noted that identical merchandise exported on the same date which was not granted an exemption, if contracted for on or after June 8, 1940 (so far as the record shows), could be acquired only at a higher cost, due to the use of the "official" rate of exchange of the pound sterling. (Statutory Rule and Order 892, as amended.) Therefore, while the cost of the two importations would differ, their value should be arrived at by some method which most nearly approximates the price at which all purchasers could obtain them. That value, it seems to the court, could be reached only by applying the "official" rate (at which it is assumed all might purchase pounds sterling) in converting the currency of the invoices.

While it is true that it is the function of the appraiser and not the collector to appraise merchandise, it is necessary to bear in mind the background of the various statutes relating to conversion of currency. The result sought to be achieved by section 522 (c) as held by the Supreme Court is "to provide in each case the rate which gives the closest approximation to the value in dollars of the imported merchandise." In view of the definitions of value as set forth in said section 402, *supra*, a holding that the "free" rate should be used in the conversion of the pounds sterling of the invoice here involved, would represent not the value of the merchandise but the cost of the currency to this particular importer.

Both section 402 and section 522 fix the date of exportation as the basis for determining duties upon imported merchandise. Employment of a rate of conversion of currency which bears no relation to the value of the goods is contrary to the intent of section 522 (c).

The woolens here involved are made dutiable by the Tariff Act of 1930 according to their value per pound (paragraph 1109). Govern-

ment counsel points out in the brief filed that the use of either the "free" or the "official" rate for the pound sterling would result in a unit of value of more than $1.25, but not more than $2 per pound and that this type of merchandise, if within those values, would be subject to the same rate of duty. However, there are many provisions of the tariff act under which the application of the "free" or "official" rates in the conversion of pounds sterling would result in a difference in classification and a corresponding difference in the rate of duty. Such a result would be at odds with the decisions which have held consistently that the purpose of statutes providing methods of conversion of foreign currency has been to determine the true value of imported goods, within the statutory limitations of uniformity.

Neither the decision of this court in the earlier *Barr* case (11 Cust. Ct. 88, C. D. 801) nor the decision of the Supreme Court authorizes the use of two differing rates of exchange by customs officials in converting the currency of invoices of goods exported from a foreign country on the same date because of differences in the contract of purchase. Nor can we find any justification in the statute for such a method.

Inasmuch as the record shows that on the date of exportation of these woolens the only exchange rate which was available to all purchasers of woolens for export to the United States was the "official" rate, i. e., $4.035, we hold that the action of the collector of customs herein in selecting that rate as a basis for conversion of the pounds sterling of the invoice was justified and was in conformity with the statute and the decisions.

Judgment, therefore, will be rendered overruling plaintiff's contention to that extent.