(C. D. 1439)

Pacific Transport Lines, Inc. *v.* United States

United States Customs Court, Third Division

(Decided July 2, 1952)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* and *Walter I. Carpeneti* of counsel) for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: This action involves the cost of certain repairs to the American freighter *New Zealand Victory* while said vessel was in Shanghai, China, and Hong Kong. It is admitted that the repairs and the costs thereof are properly assessable with duty at the rate of 50 per centum ad valorem under the provisions of section 466 of the Tariff Act of 1930. It is contended, however, that the expenses of repairs made in such foreign country are dutiable at 50 per centum of the actual cost thereof, rather than at a fictitious cost determined by use of an official rate of exchange.

Francis M. Leary, the master of the *New Zealand Victory*, testified that in January 1947, he caused certain work to be done upon said vessel. In Shanghai, the work was performed by the firm of Sung Tai & Co. There were two bills submitted therefor by Sung Tai & Co., one amounting to $2,860,000, Chinese currency, and the other $3,672,500, Chinese currency. These bills, a part of the entry papers, were marked in evidence as collective exhibit A. The witness stated that payment was made by him personally in United States currency. For the smaller bill, he paid United States $440, and for the other, United States $565, a total of $1,005. The witness testified that a representative of the agent for the steamship company advised that he pay the bills submitted by Sung Tai & Co. at the open rate of exchange quoted in the newspaper, rather than through the banks, thereby taking advantage of a 50 per centum saving. He stated that the official rate of exchange and the actual or open rate of exchange did not coincide at all, and, as a matter of fact, about a hundred per centum advantage was gained by using the open rate of exchange. In that respect, the witness testified:

A. All the Shanghai newspapers and all the Oriental newspapers carry the official rate of exchange, which will be for cable money, and the open rate, which is hand to hand money. I use the hand to hand money.

\* \* \* \* \* \* \*

X Q. And does the open rate fluctuate from hour to hour on the same day?— A. Yes, the official rate has always, in a case in China, lagged behind the open market rate a month or so. They would set a rate on paper, find out that it wasn't true or realistic, a month later they would advance the official rate to what the open rate was, and by the time they had decided that, of course, the open rate had gone ahead. They were always a month or two behind.

X Q. Who was always a month or two behind?—A. The Chinese Government.

\* \* \* \* \* \* \*

X Q. I still don't quite understand how you explain that you obtained an advantage of about a hundred per cent.—A. Well, I have the papers here to show that Sung Tai received that amount.

X Q. Received what amount?—A. And then I can show you my cash statement that I submitted to the company. I only paid a thousand and five dollars. The official rate would have been somewhere around $2000 or more.

X Q. Well, now, Sung Tai issued their bills to you in Chinese national currency, didn't they?—A. But we converted them right there.

X Q. I mean didn't they issue the bills to you in Chinese national currency?— A. Yes, he did, and he said, "See the advantage that you get by paying me in United States?"

X Q. So that you actually paid Sung Tai the number of Chinese national that he asked for in his bill, didn't you?—A. I paid—this was to Sung Tai's advantage also—I paid him not the number of Chinese dollars; we agreed on a rate, 6500 to one. The papers were publishing a rate, official rate of possibly three thousand. If I paid the company at the official rate I would have paid double a month hence; when it went through the bookkeepers and all that and they got to pay Sung Tai this money he would have had nothing, because the rate was dropping so fast.

X Q. So you and Sung Tai had an agreement as to the rate?—A. We did have an agreement, 6500 to one.

The witness also testified that in San Francisco he was reimbursed by the steamship company in the amount of $1,005, the actual amount he had taken from the safe on the ship and paid to Sung Tai & Co.

As to the other repair parts supplied at Shanghai and repairs performed at Hong Kong, the witness stated that he did not pay for certain bearings supplied by Chinese SKF Company, Ltd., of Shanghai, although he should have done so, nor the cost of repairs performed by A. Fat & Co. of Hong Kong. He did not pay A. Fat & Co. because there was no advantage for the ship on account of the rates of exchange.

Counsel for the Government objected to any of the foregoing evidence as to the rate of exchange other than the rate proclaimed by the Secretary of the Treasury for the quarter of the year applicable to the dates of sailing here involved, or to the buying rate certified by the Federal Reserve bank for such sailing date, for the reason that

evidence of any other rate is incompetent and immaterial by reason of the provisions of section 522 (b) and (c), Tariff Act of 1930, where the exclusive method for converting foreign currencies for the assessment of duty on imported merchandise is provided for. The objection was overruled by the court and the evidence allowed for whatever weight it might have.

Counsel for the Government also moved to dismiss the protest upon the ground that this court lacked the jurisdiction to review the action of the Secretary of the Treasury under section 466 except upon the one issue of whether the items in dispute constituted equipment or repairs of vessels, and inasmuch as it is admitted that the charges upon which duty was assessed pertained to the cost of repairs of the vessel *New Zealand Victory*, there is not a question presented by the protest which is reviewable by the court.

The motion was taken under advisement by the court to be passed upon by the division having jurisdiction of the subject matter. In the case of *Portland California Steamship Co.* v. *United States*, 13 Cust. Ct. 170, C. D. 889, it was admitted that the costs and charges upon which duty was assessed constituted repairs or equipment, but it was maintained that such costs and charges were incurred by reason of stress of weather. There, the Government's motion to dismiss was granted for the reason that as the statute authorizes such remission to be made by the Secretary of the Treasury if good and sufficient evidence is furnished as to stress of weather or other casualty, the court would have no jurisdiction to decide whether or not the evidence upon which the Secretary of the Treasury refused to act was in fact "good and sufficient" to warrant a remission of duties by him. The question in the case before the court here is comparable to cases where it is admitted that the articles were repairs but that the vessels against which assessed were not within the class of vessels subject to such ad valorem duty upon repairs made thereto. The plaintiff here is not attacking the 50 per centum assessment but is concerned only with the legality of the method used in obtaining the basis of costs upon which duty was assessed. This court has jurisdiction to entertain protests attacking the formula used by the customs officials in exchanging the foreign currency into United States currency in assessments made under the provisions of section 466 as well as assessments made under any other provision of the Tariff Act of 1930. Motion of Government counsel to dismiss is, therefore, denied.

The plaintiff makes but one contention, that duty should be assessed only upon the actual costs of repairs. As a matter of fact, the only evidence produced herein concerned the costs applicable to the two invoices of Sung Tai & Co., heretofore set out.

The Government contends that for the court to find the cost upon which duty should be based is a reappraisement matter and not within its jurisdiction in this branch of the court. Even though a reappraisement results, it is contended that there could be no reduction in duties because under section 503 of the act the collector is required to assess duties on the basis of the entered value or the final appraised value, whichever is higher. Government counsel points out that the entry herein was made upon the basis of the invoice foreign currency prices converted at buying rates certified by the Federal Reserve bank and urges that a finding of value at less than the final appraised value would not only reappraise in a protest proceeding but would not accomplish any change in the result.

The Government further contends that section 522 of the Tariff Act of 1930 prescribes exclusive methods of converting foreign currencies for dutiable purposes; that the repairs here involved were invoiced in the foreign currencies shown by collective exhibit A and exhibit B; that as the collector could not assess duties in such foreign currencies, it became necessary to convert the same into the currency of the United States for the purpose of the assessment and collection of such duties; and that, in so doing, the collector acted in accordance with the statute.

The court is of the opinion that the question before it is not a reappraisement matter within the jurisdiction of an appraiser but is a question solely involving the conversion of the currency of a foreign power into the currency of the United States in order that duties may be lawfully assessed thereon.

The provisions of the statute here involved provide as follows:

TARIFF ACT OF 1930

SEC. 466. EQUIPMENT AND REPAIRS OF VESSELS.

Sections 3114 and 3115 of the Revised Statutes, as amended by the Tariff Act of 1922, are amended to read as follows:

"SEC. 3114. The equipments, or any part thereof, * * * purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel, and furniture, shall be seized and forfeited. * * *

"SEC. 3115. If the owner or master of such vessel furnishes good and sufficient evidence—

 "(1) That such vessel, while in the regular course of her voyage, was compelled, by stress of weather or other casualty, to put into such foreign port

and purchase such equipments, or make such repairs, to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination; or

"(2) That such equipments or parts thereof or repair parts or materials, were manufactured or produced in the United States, and the labor necessary to install such equipments or to make such repairs was performed by residents of the United States, or by members of the regular crew of such vessel,

then the Secretary of the Treasury is authorized to remit or refund such duties, and such vessel shall not be liable to forfeiture, * * *."

SEC. 498. ENTRY UNDER REGULATIONS.

(a) AUTHORIZED FOR CERTAIN MERCHANDISE.—The Secretary of the Treasury is authorized to prescribe rules and regulations for the declaration and entry of—

\* \* \* \* \* \* \*

(9) Merchandise within the provisions of sections * * * 466 of this Act (relating to * * * repairs, and equipment on vessels * * *) at the first port of arrival;

\* \* \* \* \* \* \*

(b) APPLICATION OF GENERAL PROVISIONS.—The Secretary of the Treasury is authorized to include in such rules and regulations any of the provisions of section 484 or 485 of this Act (relating, respectively, to entry and to declaration of merchandise generally).

SEC. 522. CONVERSION OF CURRENCY.

\* \* \* \* \* \* \*

(b) PROCLAIMED VALUE BASIS OF CONVERSION.—For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after the day of the enactment of this Act, wherever it is necessary to convert foreign currency into currency of the United States, such conversion, except as provided in subdivision (c), shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of section 25 of such Act of August 27, 1894, as amended, for the quarter in which the merchandise was exported.

(c) MARKET RATE WHEN NO PROCLAMATION.—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. If the date of exportation falls upon a Sunday or holiday, then the buying rate at noon on the last preceding business day shall be used. For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange.

Section 466, *supra,* provides that the repair parts or materials to be used, or the expenses of repairs made in a foreign country, be

liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country. Section 498, *supra*, grants authority to the Secretary of the Treasury to prescribe rules and regulations for the declaration and entry of merchandise within the provisions of section 466, *supra*, relating to repairs and equipment of vessels. A reading of the foregoing sections in conjunction with each other indicates clearly an intention by the Congress that any expenses whatsoever incurred under the provisions of section 466, *supra*, shall be regarded, so far as the declaration and entry thereof are concerned, as merchandise imported into the United States. Section 522, *supra*, provides that for the purpose of the assessment and collection of duties upon merchandise imported into the United States, wherever it is necessary to convert foreign currency into currency of the United States, such conversion is to be made at values proclaimed by the Secretary of the Treasury for the quarter in which the merchandise was exported, or under certain conditions, at the buying rate in the New York market at noon on the day of exportation, which rate "shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury." There is nothing before the court to indicate that the foregoing statutes were not adhered to in the conversion of the Chinese currency appearing upon the bills of Sung Tai & Co., collective exhibit A and exhibit B.

If the contentions of plaintiff were to prevail that merchandise originating in foreign countries could be purchased in such countries upon the basis of an agreement between buyer and seller of what the foreign currencies were worth in United States currency, thus removing all official standards, the result would be disastrous to the trade of this or any other country. In the case of *Cramer* v. *Arthur*, 102 U. S. 612, the Supreme Court stated that "When Congress fixes the value by a general statute, parties must abide by that. When it fixes the value through the agency of official instrumentalities, * * * they must abide by the values so ascertained."

In the case of *Barr* v. *United States*, 324 U. S. 83, the Supreme Court, relative to the standard set for the determination of the value of foreign currencies in the currency of the United States, stated:

* * * The determination of the rate is left exclusively to the Federal Reserve Bank of New York. It alone is given discretion in computing it. * * * Congress could, of course, choose any standard of valuation, for the purposes of the assessment and collection of duties. * * *

\* \* \* \* \* \* \*

* * * It hardly need be pointed out * * * that our decision, like § 522 (c), is concerned only with the assessment and collection of duties upon

imports through the use of a formula which Congress designed. If the use of that formula under the changed conditions of these war years is disadvantageous or undesirable, Congress, of course, can change it. But we cannot assume that Congress did not mean what it said when it selected the Federal Reserve Bank of New York rather than the Secretary to perform a restricted function on this single phase of the complicated foreign exchange problem.

In the case of *Barr* v. *United States*, 17 Cust. Ct. 14, C. D. 1013, this court held that where the Federal Reserve bank certifies two buying rates—"free" and "official"—for a foreign currency, it is not the rate used in the importer's contract of purchase that governs, but the certified rate which was available to all purchasers of the involved merchandise for exportation to the United States. That holding was affirmed in *Barr* v. *United States*, 35 C. C. P. A. (Customs) 1, C. A. D. 362.

In the case at bar, the Federal Reserve bank certified but one rate for the currencies on the respective dates of sailing, remarking that such buying rates were "Nominal." See collective exhibit "D," admitted on behalf of the Government, consisting of certified photostatic copies of the original letters from the Federal Reserve Bank of New York to the Secretary of the Treasury, certifying each of the rates used on liquidation of the entry. The rates so certified were applicable here and such were legally applied.

For the reasons stated judgment will be entered in favor of the Government.